**The SAN ANTONIO EXPRESS NEWS, A Division of Hearst Corporation, and Jeanne Jakle, Appellants,**

v.

**Ted DRACOS, Appellee.**

**No. 04–95–00755–CV.**

Court of Appeals of Texas, San Antonio.

April 17, 1996.

Mark J. Cannan, Lang, Ladon, Green, Coghlan & Fisher, P.C., San Antonio, for appellants.

Judith R. Blakeway, Matthews & Branscomb, San Antonio, Ricardo G. Cedillo, Susan G. Lozano, Davis, Adami & Cedillo, Inc., San Antonio, for appellee.

Before CHAPA, C.J., and LÓPEZ and HARDBERGER, JJ.

OPINION

HARDBERGER, Justice.

This appeal arises from a defamation case brought by Ted Dracos against the *San Antonio Express–News,* Jeanne Jakle, Hart–Hanks Communications, Inc. and Hart–Hanks Television, Inc. The trial court denied a motion for summary judgment filed by the *Express–News* and Jakle; both parties then brought this accelerated, interlocutory appeal. *See* Tex.Civ.Prac. & Rem.Code Ann. § 51.014(6) (Vernon 1995); Tex.R.App.P. 42(a). For the following reasons, we sustain the appellants' points of error and reverse the trial court's judgment.

## BACKGROUND

Appellee Ted Dracos was a television reporter and news commentator for KENS–TV. Appellant *San Antonio Express–News,* a Division of the Hearst Corporation, publishes a daily newspaper of general circulation in San Antonio and South Texas. Appellant Jeanne Jakle is a columnist and television editor with the *Express–News.* She writes a column published five days a week covering matters of general interest including television, radio, motion pictures, and personalities related to those industries. Hart–Hanks Television, Inc., owns and operates KENS–TV, which broadcasts in San Antonio.

On September 22, 1993, Dracos sent the following letter to Mike Conly, the general manager of KENS–TV, complaining of his treatment at the hands of Bob Rogers, the station's news director:

Dear Mike,

I'm in a box and I'd like your help. I feel that I can no longer work for Bob Rogers. His behavior towards me—and many other employees—has been consistently abusive and demeaning. I can no longer tolerate it.

You know that I have worked hard and long for KENS. Without tooting my own horn too diligently, the number of awards and/or level of professional recognition that I have received is, I believe, equal to

any other present or past KENS employee. As a good team ballplayer, I want you to know it would be a privilege to continue working for KENS in another department or in another capacity outside of the newsroom. I feel like I have a great deal to offer, but I understand if this isn't in the cards. The radio show is something that I can do well, and I believe sincerely that it will not only be an excellent public service but will make you and KENS look very good. I'm more than willing to wait for it to evolve unless other opportunities become more attractive.

Finally, regarding any severance procedures—if it comes to that—I'm sorry but I will not deal with Bob. His word is not good. I will be happy to work with whoever else you designate.

I'm sorry for causing you any consternation. In a way, neither of us is responsible for the current situation. We both know it's not co-incidence that severe personnel problems continually emanate from the News Department. And I hope that you perceive that I have tried continually to work with Bob. Of course, I fully appreciate the tough position you are put in by these circumstances. I would like to talk with you about my feelings, but I will understand if you don't think it would be worthwhile.

KENS interpreted Dracos' letter as a letter of resignation, and quickly informed him—on September 23—that it accepted his resignation. KENS's letter reads in part as follows:

Dear Ted:

We received your letter today (September 23rd) regarding the reasons why you will be unable to continue your employment with KENS–TV. Thank you for providing us this perspective and we hereby accept your notice of resignation. As you have not been in the building this week we assume this resignation is effective immediately.

On the morning of September 25, the *Express–News* published the following story, which was written by Jakle and appeared as part of her column:

'Eyewitness Wants to Know' reporter Ted Dracos no longer works at KENS–TV.

That, according to Assistant News Director Araceli DeLeon, who said Dracos departed Thursday. 'Just like that,' she said.

DeLeon said she has no idea why Dracos quit, 'except that I understand he's done that kind of thing before.'

Reached at home Friday, News Director Bob Rogers said he, too, is in the dark about the departure. According to Rogers, 'there was no communication whatsoever' between him and Dracos about the latter leaving KENS.

The consumer feature, 'Eyewitness Wants to Know,' a staple of KENS since late-great Express–News columnist Paul Thompson turned it into a hit in the '70s and '80s, will continue, said DeLeon, though she doesn't know yet who'll be handling it.

Dracos, however, took exception to his letter being treated as a letter of resignation, and so informed KENS management—Bob Rogers, Mike Conly and Araceli DeLeon, the assistant news director at KENS—by memorandum on September 25, 1993:

I must assume that comments published by the Express–News, made by Ms. DeLeon and Mr. Rogers, to Jeanne Jakle may not be accurate. In any case, I would like an immediate public clarification if they are inaccurate and a public clarification and retraction if they are accurate.

I did not quit KENS and I have never quit KENS in the past. Further I attempted in good faith, in writing and by telephone to negotiate or at least talk about the terms of my employment with management.

I feel very strongly that the quotes given to the Express–News are highly damaging to me for many and obvious reasons. So I'm respectfully requesting that you broadcast on today's newscasts and on Monday's newscasts the truth. I would request that I be mailed the scripts for my review before broadcast. I hope that you understand and take seriously that I am asking for nothing more than fairness from KENS.

Dracos' defamation lawsuit against the *Express–News*, Jakle, and Hart–Hanks, was filed on January 12, 1995. His original petition claims that Jakle's article, with the exception of the statement that Dracos no longer works at KENS, was entirely false. He is particularly concerned about the statements that he "no longer works at KENS," that he quit "just like that," and that he has "done that kind of thing before." He claims these statements "by Ms. Jakle and the KENS–TV employees left the impression that Mr. Dracos acted in a highly irresponsible fashion," i.e., "simply walked off the job, leaving KENS–TV without any excuse for such departure, or even knowing the reason for Mr. Dracos' leaving." Dracos also claims the *Express–News* and Jakle "have engaged in a pattern of relentless written assaults" on his character and reputation.

The case was abated as to Hart–Hanks Communications, Inc., and after initial discovery, motions for summary judgment were filed by the *Express–News*, Jakle, and Hart Hanks Television, Inc.[1] The motion filed by Hart Hanks Television was granted and the cause severed; the motions filed by the *Express–News* and Jakle were denied. The parties then brought this accelerated, interlocutory appeal, raising three points of error.

### DISCUSSION

#### Standard of review

The same standard of review which governs the granting of a summary judgment applies to the denial of a summary judgment. *See, e.g., Ervin v. James*, 874 S.W.2d 713, 715 (Tex.App.—Houston [14th Dist.] 1994, writ denied). The movant for summary judgment must show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management, Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Ervin*, 874 S.W.2d at 713. In deciding whether there is a disputed material fact issue precluding summary judgment, we take evidence favorable to the non-movant as true. *Nixon*, 690 S.W.2d at 548–49. We also indulge every reasonable infer-

ence in favor of the non-movant and resolve any doubts in his favor. *Id.* If the movant's motion and summary judgment proof facially establishes his right to judgment as a matter of law, then the burden shifts to the non-movant to raise fact issues precluding summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). A defendant, to be entitled to summary judgment, must disprove at least one essential element of each pleaded cause of action or otherwise show the plaintiff could not succeed on any theory pleaded. *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 537 (Tex.1975); *Ervin*, 874 S.W.2d at 713.

The *Express–News* and Jakle based their motion for summary judgment on three grounds: (1) that each statement in Jakle's column was not defamatory; (2) that it was either true or substantially true; and (3) that the article was published without "actual malice," that is, without knowledge of its falsity or serious doubt as to its truth. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Truth is an affirmative defense in a defamation case, and the appellants have the burden of proving it by a preponderance of the evidence. *See, e.g., Frank B. Hall & Co., Inc. v. Buck*, 678 S.W.2d 612, 623 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). A defendant is entitled to summary judgment on the basis of an affirmative defense if he expressly presents and conclusively proves each essential element of the affirmative defense. *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972); *Ervin*, 874 S.W.2d at 713. We will examine each of the appellants' arguments.

#### Are the words defamatory?

Appellants' first point claims the trial court erred in denying their motion for summary judgment because, as a matter of law, the language in the publication is not defamatory. We agree.

A statement is defamatory if the words tend to injure a person's reputation.

---

1. Hart–Hanks Communications, Inc. is the parent company of Hart–Hanks Television, Inc., which owns and operates KENS–TV.

*See* TEX.CIV.PRAC. & REM.CODE ANN. 73.001 (Vernon 1986). Whether the words are capable of a defamatory meaning is a question of law for the court. *Musser v. Smith Protective Services, Inc.*, 723 S.W.2d 653, 654–55 (Tex.1987); *Einhorn v. LaChance*, 823 S.W.2d 405, 411 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). We must construe the statement as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. *Einhorn*, 823 S.W.2d at 411 (citing *Musser*, 723 S.W.2d at 655); *see also Villasenor v. Villasenor*, 911 S.W.2d 411, 418 (Tex.App.—San Antonio 1995, n.w.h.); *Diaz v. Rankin*, 777 S.W.2d 496, 498–99 (Tex.App.—Corpus Christi 1989, no writ). Only when the court determines the language is ambiguous or of doubtful import should a jury then decide the statement's meaning and the effect the statement's publication would have on an ordinary reader. *Id.*

▋ Reference to dictionary definitions is appropriate for evaluating libelous content. *See, e.g., El Paso Times, Inc. v. Kerr*, 706 S.W.2d 797, 798 (Tex.App.—El Paso 1986, writ ref'd n.r.e.), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 761 (1987). In the present case, a review of Webster's Dictionary reveals that the dictionary definition of the word "quit"—a word to which Dracos seems to take particular exception—means "to give up employment," "stop working," or to "leave." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1867 (1981). Dracos maintains that the word "quit" may not, by itself, be libelous. However, he argues, the entire Jakle article can be interpreted as defamatory because it leaves the impression he acted in a "highly irresponsible fashion, by simply walking off the job."

▋ In our opinion, however, Dracos' complaint that Jakle's article leaves the impression he "simply walked off the job, leaving KENS–TV without any excuse for such departure, or even knowing the reason for Mr. Dracos' leaving" is not actionable. As in *Musser*, the statement

> does not charge plaintiff with the commission of a crime or the violation of any law. It does not accuse him of violating any

kind of contract, such as a covenant against competition. In our opinion by no stretch of the imagination does it charge him with any unethical acts and business dealings. It accuses him of absolutely nothing except what he had a right to do. . . .

*Musser*, 723 S.W.2d at 655 (quoting 690 S.W.2d at 58). Statements must be viewed in their context and may even be false, abusive, unpleasant, or objectionable to the plaintiff without being defamatory. *Musser*, 723 S.W.2d at 654; *Schauer v. Memorial Care Systems*, 856 S.W.2d 437, 446 (Tex. App.—Houston [1st Dist.] 1993, no writ). We must also look at the entire communication and not just isolated sentences or portions. *See Musser*, 723 S.W.2d at 655; *Schauer*, 856 S.W.2d at 446. It is also important to remember that our task here is not to determine what the statement meant to the plaintiff, but whether it would be considered defamatory to the average reader. *See Herald–Post Publishing Co. v. Hervey*, 282 S.W.2d 410, 415 (Tex.Civ.App.—El Paso, writ ref'd n.r.e.).

Given the record in this case, we are persuaded a person of ordinary intelligence would not perceive the Jakle article as defamatory. The statements that Rogers was "in the dark" concerning Dracos' departure, that the two had not communicated on the subject prior to Dracos' departure, and that Dracos left "just like that" do not charge Dracos with doing anything illegal or unethical. Nor do they accuse him of breaching contractual obligations. If anything, the Jakle article "charges" Dracos with doing only that which he had a clear right to do: terminate his employment at will. To suggest such "accusations" are defamatory requires a strained interpretation. In the words of the Texas Supreme Court, "[a]ny other construction tortures the ordinary meaning." *Musser*, 723 S.W.2d at 655; *see also Hervey*, 282 S.W.2d at 415. When viewed in light of the surrounding circumstances, we find the Jakle article was neither ambiguous nor of doubtful import. As a matter of law, then, it cannot be libelous or defamatory. For this reason, the trial court's judgment must be reversed.

### Is the content true or substantially true?

■ Appellants' second point claims the trial court erred in denying their motion for summary judgment because, as a matter of law, the content of the newspaper article was true or substantially true. Again, we agree.

■ Section 73.005 of the civil practice and remedies code provides that "[t]he truth of the statement in the publication on which an action for libel is based is a defense to the action." TEX.CIV.PRAC. & REM.CODE ANN. § 73.005 (Vernon 1986). In a summary judgment proceeding involving a media defendant in which First Amendment protections are applicable, a showing by the defendant-movant of the publication's substantial truth will defeat the non-movant's causes of action. See McIlvain v. Jacobs, 794 S.W.2d 14, 15 (Tex.1990); Lewis v. A.H. Belo Corp., 818 S.W.2d 856, 858 (Tex.App.—Fort Worth 1991, writ denied); Wavell v. Caller–Times Publishing Co., 809 S.W.2d 633, 636 (Tex. App.—Corpus Christi·1991, writ denied); see also Villasenor, 911 S.W.2d at 418; Tatum v. Liner, 749 S.W.2d 251, 256 (Tex.App.—San Antonio 1988, no writ) (affirmative defense to a charge of defamation is that the statement is true). The test used in determining whether a publication is substantially true involves considering whether the alleged defamatory statement was more damaging to the plaintiff's reputation, in the mind of the average reader or listener, than a truthful statement would have been. McIlvain, 794 S.W.2d at 16. As noted by the Texas Supreme Court, this evaluation necessarily involves looking to the "gist" of the publication. Id. If the underlying facts as to the gist of the defamatory charge are undisputed, then we can disregard any variance regarding items of secondary importance and determine substantial truth as a matter of law. Id. "It is not the function of the court to serve as a senior editor to determine if the reporting is absolutely, literally true; substantial truth is sufficient." Wavell, 809 S.W.2d at 636.

Dracos argues in his brief that with the exception of the statement he no longer works at KENS–TV, the entire article is false. More specifically, Dracos' Original Petition claims that the statement he departed KENS "just like that" is untrue because it implies he quit, resigned or left KENS without notice. Dracos claims he "had discussions with Bob Rogers, the News Director and his immediate supervisor, about his job." Further, Dracos claims that he "tried repeatedly to reach the general manager, Mike Conly, in an attempt to avoid having to leave his position." He also argues that the statement that Ms. DeLeon understood Dracos had "done that kind of thing before" is untrue because he "has always honored his contracts and agreements with all his employers," and has never been fired. Finally, Dracos maintains that statements by Bob Rogers, i.e., he was "in the dark about the departure" and there was "no communication whatsoever" between him and Dracos regarding the departure, are also untrue.

Dracos also calls our attention to deposition testimony from Bob Rogers, the station's news director, and Araceli DeLeon, the assistant news director, to the effect that Dracos was a good employee, did a good job, and maintained good work habits. He claims this summary judgment evidence refutes any allegations of irresponsible behavior.

A review of the summary judgment record, however, reveals that prior to his tenure with KENS which began in October 1991 and ended in September of 1993, Dracos had twice before been employed by KENS–TV, and had twice before left that position. During his entire tenure at KENS, Dracos reported directly to Bob Rogers, the KENS–TV news director. Dracos worked very closely with Rogers, his supervisor, regarding preparation of the "Eyewitness-Wants-to-Know" news segment, which appeared on the air two-to-three times a week. Dracos said that on September 22, 1993, the day he sent the letter to Mike Conly, he had been away from the office for a week, taking either vacation or compensation time. Dracos did not remember ever talking to Rogers—whom he saw on almost a daily basis—regarding job dissatisfaction, leaving the employment of KENS, or the feelings he conveyed in the letter to Conly. Dracos' position is that Rogers was "very well-informed that I was unhappy" because of Dracos' conversations with Conly, the general manager. Dracos remem-

bered complaining to Conly about Rogers "three times, four times" in the year prior to September of 1993. The complaints included topics such as salary, Rogers' editorial control over the "Eyewitness-Wants-to-Know" program, how the program would be promoted or advertised, who would answer the viewer mail, and whether Dracos would have business cards that "reflected my position" as a "commentator" with a "special segment." Although he could not recall anything specific, Dracos characterized Conly's reaction as a "verbal shoulder shrug." Dracos said he assumed his remarks were passed on to Rogers, Conly's subordinate. Dracos also remembered trying to call Conly before writing a letter, but that he was not available.

As for Bob Rogers, the summary judgment record establishes that he was "in the dark" about Dracos' departure. Rogers remembered receiving a telephone call from Jakle on the Thursday or Friday evening before the Saturday publication of Jakle's article. He recalled telling Jakle that he was "in the dark" about Dracos' departure and that there had been no communication between Rogers and Dracos prior to the departure. Rogers also testified that Dracos' letter to Conly came without warning and caught him completely by surprise. Rogers said he was at the time, and remains, "in the dark" as to why Dracos would suddenly write that he could "no longer work for Bob Rogers." Nor, according to Rogers, was there any communication between Rogers and Dracos prior to Dracos' letter to Conly. Rogers recalled that Dracos had not been in the KENS–TV building for at least a week prior to his written ultimatum to Conly. We also note that Dracos' letter itself states unequivocally that he "will not deal with Bob." The letter is directed to Conly, without a copy to Rogers.

Jakle also placed a telephone call to Araceli DeLeon on Friday, September 24 to inquire about Dracos' departure. DeLeon was the assistant news director at KENS–TV, a position she had held for only several weeks prior to Jakle's article, and a position which required her to schedule the work of on-air personalities, including Dracos. As an assistant news director, DeLeon worked closely with her supervisor, Bob Rogers, regarding the operation of the news department. She was not authorized to furnish information or recommendations regarding KENS employees or former employees. She also did not have any authority to hire or fire Dracos, or to supervise him. She did not remember telling Jakle that Dracos had quit, that he had departed "just like that," or that "I understand he's done that kind of thing before." Regarding the latter quotation, however, DeLeon's denial was more equivocal, because she recalled telling Jakle that Dracos worked at KENS before and then left for another job.

Even if DeLeon was somewhat misquoted, it does not change the substance of Jakle's article. Dracos no longer worked at KENS on September 25, 1993. In *Masson v. New Yorker Magazine,* 501 U.S. 496, 518, 111 S.Ct. 2419, 2432–33, 115 L.Ed.2d 447 (1991), the United States Supreme Court noted that there is no "special test" when one claims falsity in quotations. Rather, "[t]he common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. [citations omitted] It overlooks minor inaccuracies and concentrates upon substantial truth." *Id.* See also *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) ("Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties.").

In the present case, there is no question that Dracos wrote a letter to Mike Conly stating that he felt he could no longer work for Bob Rogers. Conly interpreted and accepted this letter as a letter of resignation. When Jakle's article was published Dracos was no longer employed by KENS–TV. His departure was sudden and unexpected. The suddenness of the departure—"just like that"—is evidenced both by the quick exchange of correspondence and the fact that Dracos was obviously offended by the quick "acceptance" of his letter. As for the statement that Dracos had "done that kind of thing before," the statement says nothing, explicit or implicit, about whether Dracos was fired, or whether he gave any notice

before leaving KENS. It is undisputed that before his tenure of October, 1991 to September, 1993, Dracos was twice before employed by KENS–TV, and had twice before left that position.

Dracos also complains of Rogers' statements that he was "in the dark about the departure" and there was "no communication whatsoever" between Rogers and Dracos regarding his departure. But there is summary judgment evidence that this is true. Dracos, by his own admission, did not communicate with Rogers regarding the contents of his letter to Conly. Jakle's article, therefore, is true or substantially true.

### Is Dracos a public figure?

 Appellants' third point claims Dracos is a public figure for purposes of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This case held that a public official may not recover for defamation unless he shows "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726. Later, the Court applied this standard to public figures. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

 In defining "public figures," courts have used the phrases "have assumed roles of especial prominence in the affairs of society"; "occupy positions of such persuasive power and influence"; "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved"; and "they invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). *Gertz* created two classes of public figures in addition to government officials: general-purpose and limited-purpose public figures. *Einhorn*, 823 S.W.2d at 413. General-purpose public figures are those individuals who "achieve such pervasive fame or notoriety that [they] become a public figure for all purposes and in all contexts." *Id.* at 323, 94 S.Ct. at 3012. Such persons have assumed so prominent a role in the affairs of society that they have become celebrities. *Tavoulareas v. Piro*, 817

F.2d 762, 772 (D.C.Cir.), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013. Limited-purpose public figures achieve their status by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved,". *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009, or because they "voluntarily inject [themselves] or [are] drawn into a particular public controversy." *Id.* at 351, 94 S.Ct. at 3012. "In either case such persons assume special prominence in the resolution of public questions." *Id.* at 353, 94 S.Ct. at 3014. The relevant inquiry turns on "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013.

 Whether an individual is a public figure is a matter of law for the court to decide, *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966), but the examination is hardly governed by mechanical rules. Indeed, one frustrated jurist has compared defining a public figure to trying to nail a jellyfish to the wall. *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 861 n. 2 (5th Cir.1978). One also is reminded of Justice Potter Stewart's often-quoted test for obscenity: "I know it when I see it." *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964).

 In the present case, a defamation lawsuit involving a media defendant, we must try to "balance the competing interests of the public, the press, and the individual." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1291 (1980).

From its earliest days, the law of defamation made the individual's interest in his reputation supreme. Beginning with *New York Times,* however, the Court recognized the hard reality that society must afford a certain amount of "strategic protection" to defamatory statements to avoid chilling the dissemination of truth and

opinions. Thus, these decisions do not insulate the defamer because of the value of his message as such. Rather, they give the media "breathing space" to ensure "that debate on public issues [is] uninhibited, robust, and wideopen," while accommodating the conflicting need of the individual to redress wrongful injury to his reputation.

*Id.* (Citations omitted). The need to avoid self-censorship by the news media is an important societal interest. In the words of Justice Lewis Powell, "a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship." *Gertz,* 418 U.S. at 341, 94 S.Ct. at 3007. And the prospect of an unfavorable jury award may further chill free expression.

The unlimited discretion exercised by juries in awarding punitive and presumed damages compounds the problem of self-censorship that necessarily results from the awarding of huge judgments. This discretion allows juries to penalize heavily the unorthodox and the unpopular and exact little from others. Such free wheeling discretion presents obvious and basic threats to society's interest in freedom of the press.

*Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (Marshall, J., dissenting). It is for these reasons that courts must try to strike a balance between "the need for a vigorous and uninhibited free press and the legitimate interest in redressing wrongful injury." *Gertz,* 418 U.S. at 341, 94 S.Ct. at 3008. To again quote Justice Powell,

We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues. *New York Times Co. v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at

721. They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight societal value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

*Id.*

■ Bearing these principles in mind, we note that journalists and television reporters like Dracos, as well as other individuals who regularly comment on public affairs, have often been considered public figures for purposes of the *New York Times* standard. *See, e.g., Falls v. Sporting News Publishing Co.,* 714 F.Supp. 843, 847 (E.D.Mich.1989), *affirmed without opinion,* 899 F.2d 1221 (6th Cir.1990) (Sports columnist who made radio, television, and speaking appearances was a public figure "with regard to his sports writing activities"); *Loeb v. Globe Newspaper Co.,* 489 F.Supp. 481, 485–86 (D.Mass.1980) (Newspaper publisher's description of himself as " 'a publisher who regularly takes strong stands on controversial issues ... [and who] invites expression of contrary opinion' " "neatly fits the Supreme Court's recent definition of public figures: '[those who] have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved ... [and who] invite attention and comment' "); *Loeb v. New Times Communications Corp.,* 497 F.Supp. 85, 88 (S.D.N.Y. 1980) (Same newspaper publisher's "outspoken criticism of prominent politicians and celebrities in diverse fields has frequently made him the target of national and regional media coverage"); *Adler v. Conde Nast Publications, Inc.,* 643 F.Supp. 1558, 1564 (S.D.N.Y.1986) ("We find that Adler's general fame or notoriety in the literary and journalistic community and her pervasive involvement in the affairs of society render her a public figure with regard to her activities relating to literature, journalism and criticism"); *O'Donnell v. CBS, Inc.,* 782 F.2d 1414, 1417 (7th Cir.1986) (Vice president and general manager of radio station who used his editorial position to advocate a particular

point of view regarding an EPA controversy became a limited purpose public figure with respect to that controversy, including comment upon his being fired from the position through which he sought to influence that controversy); *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123, 137 (2d Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985) (Author of nine novels who waged "organized and ongoing effort to maintain media access in order to call attention to her writings and disseminate her views" was limited purpose public figure with respect to statements about her involvement in writing books and plays); *Stolz v. KSFM 102 FM*, 30 Cal.App.4th 195, 35 Cal.Rptr.2d 740, 745–46 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 79, 133 L.Ed.2d 37 (1995) (Owner, operator and general manager of Sacramento radio station was general purpose public figure "by virtue of occupying a position of general fame and pervasive power and influence in the community," ability "to reach a wide audience," selection and presentation of public affairs programs, and voluntary exposure to public scrutiny); *Knudsen v. Kansas Gas And Electric Co.*, 248 Kan. 469, 807 P.2d 71, 78 (1991) (Free-lance journalist's story on local utility, published in Kansas City Star, written in an "investigatory tone to create a public controversy," transformed him into a public figure because he "voluntarily injected himself into the public's attention"); *Rybachek v. Sutton,* 761 P.2d 1013, 1014 (Alaska 1988) (Biweekly columnist who used her column to express her views on mining and natural resources issues was a public figure with respect to her columns); *Warner v. Kansas City Star Co.*, 726 S.W.2d 384, 385 (Mo.Ct.App.1987) (Outdoor editor of Kansas City newspaper who had "regularly written prominently featured articles for the outdoor section of the newspaper, of which he was identified, by name and title, as the author," and who received numerous journalistic awards and "invited public attention to himself and to his views," was a public figure for purposes of an article concerning his discharge for alleged conflict of interest violations); *Maule v. NYM Corp.*, 76 A.D.2d 58, 429 N.Y.S.2d 891, 892–93 (N.Y.1980) (Writer for Sports Illustrated, who had made numerous television appearances, wrote 28 books on sports, received awards for his writing, and sought to "project his name and personality before millions," was a public figure, precluding his recovery for statement that he was "quite possibly the worst writer on the magazine").

Like other journalists, reporters and media personalities, Dracos has vigorously sought and achieved publicity for his journalistic efforts. His "Eyewitness-Wants-to-Know" series, for example, was a highly rated news segment and made Dracos a household name in the area reached by the *Express–News*. As a television journalist, he has enjoyed regular and continuing access to the news media. In Dracos' own words, he "developed highly popular and innovative news segments, both nationally and locally." His "Eyewitness-Wants-to-Know" segment on KENS–TV became "one of the highest rated news segments in San Antonio" and "received more viewer response than any other news segment in the South Texas market." The "Eyewitness-Wants-to-Know" format was also highly accusatory in nature. To be the subject of one of these programs was not good news to the individual involved. There were no compliments, and the criticisms were harsh. Both private and public figures were put on the rack by Dracos, who did not hesitate to lay on the verbal whip. In short, it was a fine example of the power and freedom of a vigorous free press. It is somewhat ironic that Dracos is so offended by this rather innocuous, and substantively true, article by Jakle. As a successful and well-known journalist, he enjoyed access to the media—and the self-remedy of rebuttal—which is not available to the ordinary citizen. *See Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009 ("Public officials and public figures enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then private individuals normally enjoy.")

Dracos has been frequently featured in San Antonio newspapers. For example, he was the topic of Jakle's column in November of 1988, when he publicly charged the San Antonio Police Department (SAPD) "brass" of playing golf during working hours. Ac-

cording to Jakle's article, the SAPD conducted a "top-to-bottom probe" but found no evidence of such "departmental goofing off." Also according to the article, Dracos declined the department's invitation to submit facts to support his allegations. Dracos also made Jakle's column in October of 1988 with an "Eyewitness-Wants-to-Know" report on a wheelchair-bound woman who wanted to serve on a jury but was excused anyway by the judge because of her handicap. According again to Jakle's article, Dracos did not merely report the events or interview the participants; he met with the woman "and took her to confront the judge." The summary judgment record also contains a photocopy of a Jakle column discussing an "Eyewitness-Wants-to-Know" report on landfills on the east side of San Antonio. Jakle's column—the date is unclear—questions the accuracy of Dracos' reporting, concluding that while the audience was "given a sequence of aerial photos of landfills," "presumably garbage dump sites," "there was apparently no effort made to determine what was dumped there." The article noted that while Dracos was unavailable for comment, he had previously argued that his segments "are supposed to be editorials."

This is not the first time Dracos has been before our courts. After his second tenure with KENS ended in November of 1988, Dracos sued Jakle and the *Express–News* concerning the following article by Jakle, which was published on January 5, 1989:

"Eyewitness Wants to Know" reporter Ted Dracos is history.

Four weeks ago, a 40–ish Ted reportedly stormed out of KENS after a disagreement with News Director Bob Rogers. He's been off the air ever since. After two weeks of explaining his absence as "vacation," PR Director Susan Korbel finally confirmed Wednesday that Dracos is gone for good.

The inside report is that Rogers was unhappy with some of the stuff Dracos had been putting on the air.

Their confrontation took place soon after a piece I did that asked why Dracos didn't retract his charge that police were playing golf on taxpayer time when he had no facts to back it up.

Criticism appeared elsewhere about a Dracos landfill piece; there, Rogers was even dumped on.

Meantime, stop calling 554–4435—Ted Dracos' "Eyewitness Wants to Know" line—with your news tips.

During this prior litigation, Dracos' attorney signed an agreed order, on May 10, 1990, which was entered in response to a motion for a protective order filed by KENS–TV and certain KENS employees, and a motion filed by the *Express–News* and Jakle to compel KENS to produce testimony and documents. At the bottom of the order, which denies KENS's request for a protective order and grants the motion to compel, there is the following handwritten notation:

The parties to this lawsuit have stipulated as evidenced by the signature of their counsel to this order that for the purposes of this lawsuit the Plaintiff was a public figure as that term is defined by the United States Supreme Court in the cases of *New York Times v. Sullivan* and *Gertz v. Welch.* Based on that stipulation the Defendants have withdrawn their request for the KENS–TV documents relating to the popularity of the Eyewitness Wants to Know program prepared by Plaintiff. Defendants also agree that their request for all documents relating to Ted Dracos not previously produced by KENS–TV will be satisfied by the production of any further documents discovered after a reasonable and diligent search and an affidavit from an appropriate officer of KENS stating under oath that such reasonable and diligent search has been made.

The order is signed by Dracos' counsel and counsel for KENS–TV. During the hearing Dracos' counsel also stated:

*We wish that Mr. Dracos would not be a public figure, but unfortunately, I think that we are left with the fact that he was a public figure at the time of the publications by Ms. Jakle. So yes, I think we would agree and could stipulate to the fact that he is a public figure.*

(Emphasis added).

While Dracos' judicial admission in that case may not control the outcome of this

case, it is a fact that he has conceded on one occasion he was a public figure "as that term is defined by the United States Supreme Court," at a time when he was performing the same job (investigative reporter and commentator), and doing the same work ("Eyewitness–Wants–To–Know"), for the same employer (KENS–TV). It is at least evidentiary support for appellants' argument that Dracos was a public figure at the time the *Express–News* published Jakle's September, 1993 article.

Dracos' own pleadings and testimony also support the idea that he is a public figure. By his own admission, he was more than a television journalist—he was a "commentator" with a "special" news segment. According to Dracos' Original Petition, he "has received many awards, and developed highly popular and innovative news segments, both nationally and locally." Moreover, "[h]is 'Eyewitness–Wants–To–Know' segment on KENS–TV became one of the highly rated news segments in San Antonio within the first six months of its airing." As a journalist and self-described public commentator, Dracos cannot hold himself out as a popular television personality and yet deny he is a public figure for purposes of the *New York Times* standard and the First Amendment. He cannot, in other words, have it both ways—stepping into the limelight as a public commentator, yet avoiding it for purposes of defamation law and the First Amendment. Given the summary judgment record in this case, we therefore hold that Dracos was a public figure at the time the *Express–News* published Jakle's September, 1993 article.

■ Having determined that Dracos was a public figure for purposes of the *New York Times* standard, we must now determine whether the *Express–News* and Jakle acted with actual malice as a matter of law. "Actual malice, as used in defamation cases, is a term of art which is separate and distinct from traditional common law malice." *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989). A public official or public figure cannot recover damages for defamation unless he proves by clear and convincing evidence that the defendant published false and defamatory statements about him with actual malice. *See*

*Casso,* 776 S.W.2d at 554; *see also Brady v. Cox Enter., Inc.,* 782 S.W.2d 272, 275 (Tex. App.—Austin 1989, writ denied); *Freedom Communications, Inc. v. Brand,* 907 S.W.2d 614, 615 (Tex.App.—Corpus Christi 1995, no writ). Actual malice does not include ill will, spite or evil motive. *Casso,* 776 S.W.2d at 558; *Freedom Communications,* 907 S.W.2d at 620. Rather, it is the making of a statement with knowledge that it is false or with reckless disregard of whether it is true. *Carr v. Brasher,* 776 S.W.2d 567, 571 (Tex. 1989). The complainant in a defamation case must show that the declarant knew the statements were false or that the declarant acted with reckless disregard of whether they were false or not. *Casso,* 776 S.W.2d at 559 (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964)); *see also Freedom Communications,* 907 S.W.2d at 619; *Martin v. Southwestern Elec. Power Co.,* 860 S.W.2d 197, 199 (Tex.App.—Texarkana 1993, writ denied); *Johnson v. Southwestern Newspapers Corp.,* 855 S.W.2d 182, 187 (Tex.App.—Amarillo 1993, writ denied).

■ Courts have defined "reckless disregard" as a high degree of awareness of probable falsity, for proof of which the plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Freedom Communications,* 907 S.W.2d at 620; *see also Carr,* 776 S.W.2d at 571; *Casso,* 776 S.W.2d at 558; *Brady,* 782 S.W.2d at 276. A statement could also be defamatory by implication. *Mitre v. Brooks Fashion Stores, Inc.,* 840 S.W.2d 612, 620 (Tex.App.—Corpus Christi 1992, writ denied). But "actual malice can neither be 'inferred from falsity' of the challenged statement alone, *see Martin,* 860 S.W.2d at 200, nor from the frequency of a publisher's criticism of a public official's performance." *Freedom Communications,* 907 S.W.2d at 620.

■ Jeanne Jakle's affidavit, in addition to the other summary judgment evidence— Bob Rogers' post-publication testimony and the exchange of correspondence between

Dracos and the management of KENS–TV—establishes that she either believed the statements in her article were true or did not have a high degree of awareness as to their falsity. A defendant's affidavit setting forth the absence of actual malice is sufficient to carry the movant's summary judgment burden of proof. *Casso,* 776 S.W.2d at 558; *Carr v. Brasher,* 776 S.W.2d at 571; *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939, 941–42 (Tex.1988).

Even if Araceli DeLeon was misquoted, this fact is of no consequence. In *Masson,* for example, the Supreme Court recognized that alteration of words does not equate with knowledge of their falsity unless there is "a material change in the meaning conveyed by the statement." 501 U.S. at 517, 111 S.Ct. at 2433. In this case, the thrust of the *Express–News* story was that Dracos was no longer employed by KENS–TV, that he had left of his own will, i.e. "quit," and that the departure was sudden, i.e. "just like that." The summary judgment evidence confirms this to be true or substantially true; and Jakle's affidavit, when considered alongside the other summary judgment evidence, confirms that she thought the information was true when she reported it.

To overcome Jakle's affidavit and the other summary judgment evidence, Dracos had to offer specific, affirmative proof to show that the *Express–News* and Jakle either knew the publication was false or entertained serious doubts as to its truth. *Howell v. Hecht,* 821 S.W.2d 627, 631 (Tex.App.—Dallas 1991, writ denied). This, Dracos has clearly failed to do. Indeed, there is no competent summary judgment evidence that rebuts the defendants' proof. For this reason alone, appellants are entitled to judgment as a matter of law.

The judgment of the trial court is reversed. The cause is remanded to the trial court for further proceedings consistent with this opinion.