Todd **MORRIS**, et al., Appellants,

v.

The **DALLAS MORNING NEWS, INC.**, Appellee.

No. 10–96–024–CV.

Court of Appeals of Texas, Waco.

Nov. 13, 1996.

Rehearing Overruled Dec. 11, 1996.

**412**

David H. Martin, Malesovas & Martin, Waco, for appellants.

Matt Dawson, Dawson, Sodd, Moe, Jacobson & Beard, Corsicana, Paul C. Watler, Jenkens & Gilchrist, P.C., Dallas, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

Appellants Todd Morris and Jeff Schafer, officers with the Corsicana Police Department, sued the appellee, the Dallas Morning News, for allegedly libelous accounts of their involvement in the arrest of an individual, Craig Steven Thomas, who died while in police custody. The Dallas Morning News moved for summary judgment on the grounds of, *inter alia*, truth and no actual malice. Appellants in a single point of error contend the court erred in granting the motion. We affirm.

### I. STANDARD OF REVIEW

A summary judgment is proper only when a movant establishes that there is no genuine issue of material fact and he is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true and every reasonable inference resolved in the his favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). A defendant is entitled to summary judgment if he can establish, as a matter of law, that there is no genuine issue of material fact about one or more of the essential elements of the plaintiff's cause of action or if he can establish all of the elements of an affirmative defense as a matter of law. *Randall's Food Markets*, 891 S.W.2d at 644; *Barbouti v. Hearst Corp.*, 927 S.W.2d 37, 64 (Tex.App.—Houston [1st Dist.] 1996, writ filed) (on rehearing). Where, as here, the trial court's order does not specify the grounds relied on for its ruling, the court on appeal will affirm the summary judgment if any of the grounds in the motion has merit. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996); *Barbouti*, 927 S.W.2d at 64.

### II. THE SUMMARY JUDGMENT EVIDENCE

We will state the facts in the light most favorable to the appellants. The following is not to be understood either as an accurate or a thorough rendition of the events as they actually occurred. They are the facts as we see them through the summary judgment prism.

#### a. Thomas' arrest and death

On June 5, 1993, Officer Morris was patrolling an area of Corsicana known as "the Hill"

where frequent illegal drug transactions are reputed to occur. While sitting in his parked patrol car that evening, Officer Morris noticed a brown, two-door Chevrolet make a quick turn a few blocks from his location. Officer Morris recognized the car as one belonging to Craig Thomas, a person known by Officer Morris to have a history of using illegal drugs. Officer Morris began to follow the brown Chevrolet, and while so doing, he noticed that the vehicle's registration permit had expired. Upon pulling over the vehicle for the expired registration, Officer Morris found Thomas in the passenger seat and a companion, Robert James, in the driver's seat. As Officer Morris spoke with Mr. James, Thomas exited the vehicle. Officer Morris ordered Thomas, who by acting very nervous and agitated appeared to Officer Morris to be intoxicated by cocaine, to get back inside the vehicle, and Thomas complied. Thomas, however, decided to once again exit the vehicle, and Officer Morris again ordered him to get back inside. Thomas returned to his seat in the vehicle, but he did not remain long before he jumped out of the car again and fled the scene.

Officer Morris chased Thomas for several blocks on foot. During such time Officer Morris witnessed Thomas throw a small container into a thicket of tall weeds. Officer Morris suspected narcotics were contained therein. Officer Morris eventually caught up to Thomas and tackled him, causing both men to tumble into a ditch overgrown with high grass. Thomas physically and violently resisted Officer Morris' efforts to subdue him. Thomas swung at Officer Morris several times, but Officer Morris was able to deflect most if not all of Thomas' attempts to hit him. During the altercation, Officer Morris, in response to Thomas' efforts to hit him, punched Thomas several times around the face and upper torso as hard as he could with a closed fist. Officer Morris used physical force to subdue Thomas for two reasons: (1) Thomas was using force against him, and (2) he believed there was a real chance that Thomas would escape.

Officer Morris was ultimately able to force Thomas on his back, whereupon he attempt-ed to pin Thomas in that position by straddling him. Believing at the moment that he had Thomas temporarily under control, Officer Morris retrieved his walkie-talkie from his equipment belt to request assistance. Thomas, however, began to kick and squirm and struggle free. Officer Morris, afraid that Thomas might make a move for his firearm, then struck Thomas once in the head and possibly in the face with his walkie-talkie, knocking the battery out of it. Officer Morris continued to fight with Thomas, ultimately overpowered him, and finally locked his wrists together behind his back with handcuffs. Officer Morris then found the missing battery, replaced it in the walkie-talkie, and called for assistance.

Concerned that the responding officers would be unable to see him and Thomas down in the overgrown ditch, Officer Morris dragged Thomas out of the ditch and onto higher ground. Officer Schafer was the first of the officers who responded to the call to arrive at the scene. After Officer Schafer arrived, Thomas, although lying on his stomach with Officer Morris sitting on his back, continued to struggle and resist. In an effort "to get his attention,"[1] Officer Morris "spatted" Thomas across the face. A spat is a broad slap with an open hand the force of which makes a smacking sound. WEBSTER'S NEW INTERNATIONAL DICTIONARY 2412 (2nd ed. 1948). Officer Schafer then helped Officer Morris restrain Thomas so that a hobble restraint could be applied. According to Officer Morris, a hobble restraint is an approximately four-foot long piece of nylon webbing with a clip on one end and a loop on the other that some law enforcement officials use to tie the arms and legs of a suspect behind his back. Officer Schafer helped by kneeling on one of Thomas' arms and part of Thomas' back or legs while Officer Morris tied the hobble restraint. At or shortly before this time, several more Corsicana police officers arrived. Officers Morris and Schafer then carried Thomas, who was lying on his stomach, to Officer Schafer's patrol car and, with the assistance of a third officer, put him in the back seat. Before Officers Morris and Schafer put Thomas in the patrol car, they

---

1. Officer Schafer's words.

noticed only one visible injury—a small cut around his right cheekbone or temple with a small amount of blood escaping therefrom. Officer Schafer and one other Corsicana police officer transported Thomas to the police station.

A short time after Thomas was secured in the patrol car, he became quiet. Officer Schafer believed that Thomas had simply exhausted himself by resisting and did not believe anything was physically wrong with him. When Officer Schafer arrived at the police station with Thomas, and he was removed from the patrol car, his eyes appeared glassy, his breathing was irregular, and he was not responding to efforts to catch his attention. Paramedics were called immediately to the scene. Upon arrival, the paramedics found a pulse in Thomas, but they soon lost it. They defibrillated him, and his heart started beating again. The paramedics however were unable to sustain a heartbeat, and Thomas died at a local hospital a short time later.

### b. The autopsies

Thomas' body was sent to the Dallas County Medical Examiner for an autopsy. Pathologist Charles B. Odom, M.D., performed the examination and on June 14, 1993, determined that Thomas died "as the result of the combined cardio (heart) respiratory (breathing) depressive effects of physical exertion and anxiety (flight, altercation with blunt force injuries, and arrest), multiple drugs (drinking alcohol, cocaine, cocaethylene [a chemical created by the mixing of cocaine and alcohol], and possibly marijuana), and a physical restraint position that to some degree, at least, compromises respiratory function." Dr. Odom further stated, "In my opinion, the combined effect of all of these factors resulted in the cardiac arrest [heart attack] and death. None of the factors, acting alone, without the associated effects of the other factors, would likely produce a lethal result." His final conclusion was that Thomas' death was an accident.

Local NAACP leaders, believing that the "blunt force injuries" inflicted upon Thomas during the incident had a larger role in Thomas' death than what Dr. Odom claimed,

decided to have another autopsy performed. They hired Dr. Joye M. Carter, Chief Medical Examiner for the District of Columbia, to perform a second autopsy. On July 1, 1993, Dr. Carter released her conclusions in the following format:

Cause of Death: Multiple blunt force impact to the head, trunk and extremities with positional compromise of respiratory system following arrest for agitated behavior

Part II: Acute and chronic substance abuse with cardiac hypertrophy

Manner of Death: Accident

### c. The internal investigation

An investigation into the incident was undertaken by Detective Rex Givens of the Corsicana Police Department. Detective Givens interviewed all of the officers involved, some of the witnesses at the scene, and examined the physical evidence. He concluded that neither Officer Morris nor Officer Schafer violated any department policies concerning the use of force in overpowering a physically combative suspect.

On June 25, 1993, Chief of Police J.L. Palos, apparently disagreeing with Detective Givens' determinations, concluded that both officers had used excessive force, and he suspended them indefinitely without pay. Both officers, however, were later reinstated when Chief Palos presumably determined that the officers had actually acted properly.

### d. The contested statements

Appellants complain of four statements made in four different articles written by employees of the Dallas Morning News and published by that newspaper. The statements and the dates on which they appeared, as quoted by appellants in their brief, are set out below:

June 19, 1993 [The medical examiner's office] reported that Mr. Thomas died of . . . injuries suffered during his arrest.

July 10, 1993 A new autopsy . . . has found that the death was caused by blows to the head[.]

July 18, 1993 Mr. Thomas died after a beating by white police officers. The

second autopsy indicated the death was caused by blows to the head.... Two officers have been fired for using excessive force[.]

September 2, 1993 The second autopsy ... ruled ... that blows to the head ... and being hogtied were the primary causes of Mr. Thomas' death.

## III. THE LAW ON DEFAMATION

 To sustain a defamation cause of action, a public official or public figure must prove that the defendant (1) published a statement; (2) that was defamatory concerning the public official or public figure; and (3) that the false statement was made with actual malice. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964)); *see* TEX. CIV.PRAC. & REM.CODE ANN. § 73.001 (Vernon 1986).[2] A defendant makes a statement with actual malice if he makes it with knowledge of its falsity or with reckless disregard of its truth. *Randall's Food Markets,* 891 S.W.2d at 646. Proof of ill will, spite, or evil motive does not establish malice. *Hagler v. Proctor & Gamble Mfg. Co.,* 884 S.W.2d 771, 772 (Tex.1994); *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989). Rather, actual malice is established by offering "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Casso,* 776 S.W.2d at 558 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)). A defendant to a defamation suit brought by a public figure is entitled to a summary judgment if he conclusively establishes that the disputed statement was either true or substantially true.[3] A statement is substantially true unless the alleged defamatory statement is more damaging in the mind of the average listener to the plaintiff's reputation than a truthful statement. *McIlvain v. Jacobs,* 794 S.W.2d 14, 16 (Tex.1990).

## IV. ANALYSIS

We now turn to the statements, themselves, to determine whether the trial court erred in granting summary judgment.

### a. The June 19 article

 Appellants apparently contend that the June 19 article is factually incorrect because the Dallas County autopsy report did not indicate that Thomas died as the result of injuries suffered during his arrest but for other reasons. Appellants, however, do not quote the statement in its entirety. *Carr,* 776 S.W.2d at 570. Allegedly libelous statements must be construed as a whole, in light of the surrounding circumstances based upon how a person of ordinary intelligence should perceive the entire statement. *Id.* The statement reads, in full:

> [The Dallas County medical examiner's] office reported that Mr. Thomas died of a combination of drugs, alcohol and injuries suffered during his arrest. Respiratory problems also contributed, possibly from having his hands tied to his ankles behind his back, the report said. His injuries included cuts and bruises on his face, back and extremities, as well as a broken bone in the mouth area.

The statement is either true or substantially true. As indicated above, the Dallas County autopsy opined that Thomas died "as the result of the combined cardio (heart) respiratory (breathing) depressive effects of physical exertion and anxiety (flight, altercation

---

2. Appellants concede in their brief that they are either public figures or public officials, at least for the purposes of this lawsuit. Accordingly, they must prove more than that the Dallas Morning News was negligent: they must prove actual malice on its part. *See Dixon v. Southwestern Bell Tel. Co.,* 607 S.W.2d 240, 242 (Tex.1980); *Procter & Gamble Mfg. Co. v. Hagler,* 880 S.W.2d 123, 126 (Tex.App.—Texarkana), *writ denied,* 884 S.W.2d 771 (Tex.1994).

3. In defamation suits brought by private individuals, the Texas Supreme Court has held that truth is an affirmative defense. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 648 (Tex.1995). The court, however, is yet to decide whether truth/falsity is an affirmative defense or an essential element of the plaintiff's cause of action in defamation suits brought by public officials or figures. *Id.* n. 6. The distinction bears no difference in summary judgment proceedings; therefore, there is no need for us to rule on this issue. *See id.; Casso v. Brand,* 776 S.W.2d 551, 555 n. 3 (Tex.1989).

with blunt force injuries, and arrest), multiple drugs ([alcohol], cocaine, cocaethylene, and possibly marijuana), and a physical restraint position that to some degree, at least, compromises respiratory function." Also within the autopsy report was a finding that Thomas' hyoid bone was fractured. The hyoid bone is "a bone or complex of bones situated at the base of the tongue and supporting the tongue and its muscles." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 569 (10th ed. 1993). The Dallas County autopsy indicated that blunt force injuries contributed to Thomas' death, and appellee accurately reported this fact. Appellee through its summary judgment proof established the truth or substantial truth of the June 19 article as a matter of law. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991) (law on defamation overlooks minor inaccuracies and concentrates upon substantial truth); *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 256 (Tex.App.—San Antonio 1996, no writ).

**b. The July 10 and September 2 articles**

■ The statements in the July 10 and September 2 articles are also true or substantially true. With regard to the July 10 statement, appellants again fail to give a complete quotation of the statement. It reads, in full, "A[ ] new autopsy on a man who died last month in Corsicana police custody has found that the death was caused by blows to the head and being hogtied after his arrest." The source of appellants' argument is that the District of Columbia autopsy actually indicated that Thomas died from "[m]ultiple blunt force impact," not "blows to the head." In his deposition testimony, which was included in the summary judgment evidence, Officer Morris admitted that he struck Thomas in the upper part of his body, and possibly his head, three to five times with his fist as hard as he could. He also stated that he struck Thomas somewhere around the head once with his walkie-talkie. Deposition testimony was also provided from Officer

Schafer that Officer Morris spatted Thomas. Officer Morris in his deposition could not recall spatting Thomas, but he admitted that "[i]t could have happened." Officer Morris further stated in his deposition that all of Thomas' external injuries occurred during the arrest incident. The conclusion necessarily and logically follows that the blunt force impact indicated in the report was the result of blows to the head delivered by Officer Morris. Appellants may be correct in their assertion that a blunt force impact to the head is not always caused by a blow or blows to the head, but the summary judgment evidence here established conclusively that the blunt force impact to Thomas' head was caused by Officer Morris' fist, palm, and walkie-talkie. *Masson,* 501 U.S. at 517, 111 S.Ct. at 2433; *see Dracos,* 922 S.W.2d at 256. Appellee has proven as a matter of law the truthfulness or substantial truthfulness of the July 10 statement.

Appellants' complaint against the September 2 statement is identical to that of the July 10 statement. Therefore, it, too, is without merit.[4]

**c. The July 18 article**

**1. TRUTH**

■ According to the summary judgment evidence, the contested statement in the July 18 article can be considered neither true nor substantially true. In a clear and forthright fashion, the article asserts as a matter of truth that "Mr. Thomas died after a beating by white police officers." A beating has been defined as "an act of striking with repeated blows so as to injure or damage[.]" MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 100 (10th ed. 1993). Appellee would have us conclude that Thomas died after being beaten by Officer Morris and that this beating can be properly attributed to Officer Schafer because he held down Thomas while Officer Morris spatted him. Notwithstanding the definition of "beating" provided in Webster's, we hold as a matter of law that a true "beating," especially when used to describe a

---

4. While appellants quote the September 2 statement in sufficient length, they do not quote it accurately; i.e., they include ellipses where ellipses should not be. A correct quotation of the

statement would be: "The second autopsy ... ruled that blows to the head and being hogtied were the primary causes of Mr. Thomas' death."

violent encounter between law enforcement officials and a criminal suspect, has an added element that the person must be in a helpless position as he is being repeatedly struck.

■ Upon reviewing the summary judgment evidence, we find that Officer Morris' punches were thrown while there was a real threat of Thomas' escaping from custody and only after Thomas attempted to strike him first and then continued to try to strike him. The evidence also indicates that Officer Morris stopped throwing punches at Thomas once Officer Morris had Thomas pinned on his back. Thomas, however, tried to escape from Officer Morris' hold, which caused Officer Morris to strike Thomas with his walkie-talkie. The two men then continued to fight until Officer Morris was able to handcuff Thomas' wrists behind his back. Thomas nevertheless persisted in his efforts to resist, which compelled Officers Morris and Schafer to attempt to apply the hobble restraint. Thomas resisted the officers' efforts to apply the hobble restraint, which prompted Officer Morris, with Officer Schafer helping to hold him down, to spat Thomas once.

The blows to Thomas' head and upper body cannot be considered to have been a part of a beating. The summary judgment evidence indicates that Officer Morris only threw the punches at Thomas after Thomas first tried to strike him and then continued to strike him. Thomas clearly was not in a helpless state at this time. He was trying to strike Officer Morris, was trying to escape, and Officer Morris believed that Thomas had a chance of escaping. We must accept Officer Morris' depiction of his thought processes at the time as the truth. *See Valley Stockyards Co. v. Kinsel,* 369 S.W.2d 19, 20 (Tex. 1963) (a summary judgment is rarely appropriate on the issue of intent); *Clark v. Pruett,* 820 S.W.2d 903, 906 (Tex.App.— Houston [1st Dist.] 1991, no writ). Therefore, these blows cannot be considered a beating or even a part of a beating.

This rationale applies to the walkie-talkie incident as well. Thomas was trying to escape from Officer Morris, who had pinned Thomas on his back, when Officer Morris struck Thomas because he was concerned that Thomas would wriggle free and make a move for Officer Morris' weapon. Because Officer Morris believed Thomas posed a threat to him by trying to escape possibly with the intent to seize Officer Morris' weapon, Thomas was not in a state of helplessness when he was struck by the walkie-talkie.

Then, with regard to the spatting incident, we note that Officer Morris only spatted Thomas once. We agree with the Webster's definition that a beating requires multiple blows. A single spat does not constitute a beating.

Considering a second element of the "beating" definition, we also conclude that Officers Morris and Schafer, at least according to the summary judgment evidence, did not possess the requisite intent to "injure or damage" Thomas. The proof presented indicates that Officer Morris (1) punched Thomas only with the intention to subdue him so that he could be arrested, (2) hit him with the walkie-talkie so he could not escape from him and make a move for his weapon, and (3) spatted him to "get his attention." An intention to strike someone to subdue him is not the same as an intention to strike someone to injure him. The summary judgment evidence indicates that Officer Morris' intention was solely to subdue, not injure, Thomas. With regard to Officer Schafer, there is no evidence in the record whatsoever that he had the intent to strike or to help Officer Morris strike Thomas. The summary judgment proof indicates only that Officer Schafer held down Thomas so that the hobble restraint could be applied, not so that Officer Morris could spat him. *See Kinsel,* 369 S.W.2d at 20; *Clark,* 820 S.W.2d at 906.

Appellee also argues that appellants can be considered to have beaten Thomas because they tied his feet and hands together behind his back. A beating, however, requires affirmative striking. A beating does not occur by restraining someone, unless the restraining is done so that the victim can be beaten. As we indicated above, (1) the blows inflicted upon Thomas by Officer Morris did not constitute a beating and (2) neither officer possessed the requisite intent to "beat" Thomas. Therefore, appellants cannot be considered to have beaten Thomas by applying the hobble restraint.

The summary judgment evidence fails to conclusively establish that the July 18 statement was either true or substantially true.

## 2. ACTUAL MALICE

■ The Texas Supreme Court has held that a defendant to a defamation suit can, by filing an uncorroborated affidavit, establish as a matter of law that he did not make his contested statement with actual malice. *Carr,* 776 S.W.2d at 571; *Casso,* 776 S.W.2d at 558–59; *see* TEX.R.CIV.P. 166a(c). The affidavit must be "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX.R.CIV.P. 166a(c). The phrase

> "could have been readily controverted" [in defamation summary judgment cases] does not simply mean that the movant's summary judgment proof could have been easily and conveniently rebutted. Rather, it means that [the] testimony at issue is of a nature which can be effectively countered by opposing evidence. If the credibility of the affiant or deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate. On the other hand, if the non-movant must, in all likelihood, come forth with independent evidence to prevail, then summary judgment may well be proper in the absence of such controverting proof.

*Casso,* 776 S.W.2d at 558.

Appellee filed with its motion for summary judgment an affidavit from the author of the July 18 article, Selwyn Crawford, wherein she stated that when she wrote the article she "believed it was true, . . . had no doubts that it was true and had no awareness of probable falsity of any of the article." To support these assertions, Crawford referred to the sources she relied upon in drafting the article, i.e., unspecified articles in the Dallas Morning News and the *Fort Worth Star–Telegram* and unspecified news coverage on Dallas–Fort Worth broadcast media concerning Thomas' arrest and ensuing death. The only specific source to which Crawford refers is the July 10 article in the Dallas Morning News, which was written by a.co-employee, Lee Hancock. Because it is the only specific

source to which she refers, it is the only evidence that we can consider in determining whether Crawford's affidavit, standing alone, conclusively established a lack of actual malice. *See El Periodico, Inc. v. Parks Oil Co.,* 917 S.W.2d 777, 778 (Tex.1996); *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984). With regard to Hancock's authoring of the July 10 article, Crawford stated:

> I believed that Ms. Hancock had been to Corsicana to cover news events about the Thomas case, that she had interviewed persons directly involved in it including Corsicana interim police chief Lewis Palos, David Martin, the attorney for officers Todd Morris and Jeff Schafer, and Robert Sanders, Corsicana president of the NAACP, and that .she had obtained and read official reports of the two autopsies of Craig Thomas.
>
> . . . . .
>
> At the time I wrote the July 18 article, I had known Lee Hancock for more than five years and knew her to be an excellent reporter with a reputation for accuracy. I also believed [t]he [Dallas Morning] News and the [Fort Worth] Star–Telegram had [ ] reputation[s] for accuracy. I had heard of no complaints regarding any news coverage by Ms. Hancock about the Thomas case or by any other reporter or news organization. Consequently, I believed the news coverage I read and heard about the Thomas case, including the July 10 article, was accurate and I had no doubts as to its accuracy. I had no awareness that any of the news coverage was inaccurate. . . . More specifically, when I wrote[,] "Mr. Thomas died after a beating by white police officers," I believed that was true and had no doubts as to whether it was true.

Appellants presented no summary judgment evidence to controvert Crawford's affidavit in their response to appellee's motion. *See Casso,* 776 S.W.2d at 559 (if an interested witness in a defamation suit denies actual malice in an uncontroverted affidavit and the affidavit meets the requirements of TEX. R.CIV.P. 166a(c), summary judgment is appropriate).

The complete text of Hancock's July 10 article was included in the summary judgment evidence. It reads:

A[ ] new autopsy on a man who died last month in Corsicana police custody has found that the death was caused by blows to the head and being hogtied after his arrest.

The autopsy by Washington, D.C., Chief Medical Examiner Joye Carter, which was financed by the NAACP, places greater emphasis on injuries caused during the arrest of Craig Thomas than the original autopsy last month by the Dallas County medical examiner's office.

NAACP officials in Corsicana said Friday that the new results strengthen their contention that Mr. Thomas, a 29–year–old black man, was beaten to death by white police officers.

"The findings are similar to the first on a lot of things, but there are some things in there that we think will help in pressing for criminal charges against the officers,["] said Tinnis Manning, vice president of the Navarro County NAACP.

Both autopsies ruled Mr. Thomas' manner of death as accidental.

Chief Dallas County Medical Examiner Jeffrey Barnard said both autopsies reached similar conclusions but he supports the original autopsy findings that Mr. Thomas' death was caused by several factors.

Two police officers have been fired for using excessive force and violating departmental policies during the arrest June 5, when Mr. Thomas bolted from a car that had been stopped for a routine traffic violation. Each officer has denied wrongdoing and is appealing his dismissal.

Their attorney, David Martin of Corsicana, has criticized the decision to seek a second autopsy as an attempt by NAACP officials and Mr. Thomas' family to bolster unfounded allegations against his clients.

On Friday, he said the second autopsy looked similar to the first.

"I've never known the Dallas medical examiner to be biased toward anyone. This doesn't say there's a discrepancy.

She just had a change of opinion," Mr. Martin said.

Dr. Carter did not return telephone calls Friday.

The Dallas medical examiner's autopsy found that Mr. Thomas' death was caused by a combination of alcohol and cocaine in his bloodstream, an enlarged heart, the cardiac strain of a foot chase and struggle with police and respiratory problems caused by being hogtied.

The new autopsy report by Dr. Carter states that alcohol and drugs and cardiac stress contributed to Mr. Thomas' death but that "multiple blunt force impact to the head, trunk and extremities with positional compromise of respiratory system" was the primary cause.

Dr. Barnard said he met with NAACP officials to discuss the two autopsy findings. He said each contains largely similar conclusions.

"They were concerned because the manner of death was ruled accidental, that precluded any further legal prosecution. I tried to explain to them that that's not true," he said.

He said the only potentially lethal blunt force injury sustained by Mr. Thomas was a neck injury, which included a fracture of a small bone in his larynx.

The Dallas medical examiner who performed the first autopsy, Dr. Charles B. Odom, determined that the neck injury was not fatal after receiving information that Mr. Thomas was talking to police officers while being transported to jail and later lapsed into unconsciousness.

Evidence that Mr. Thomas immediately fell unconscious could possibly change the pathologist's finding, Dr. Barnard said.

The pathologist also did not find extensive swelling or hemorrhaging around the injury capable of blocking Mr. Thomas'[ ] airway—which also likely would have been present if the wound were fatal, he said.

"Based on what we have, the appropriate opinion was rendered in Dr. Odom's report. I don't disagree with his opinion, and Dr. Carter's report has similar findings," Dr. Barnard said.

NAACP officials said they will turn over the results of the new autopsy to the Texas attorney general's office, which has been appointed special prosecutor in the Thomas case.

The office is completing an investigation of the death. State prosecutors have said they expect to present the case to a Navarro County grand jury within the next two weeks.

Nowhere in the article is it stated, as a matter of truth, that Thomas was beaten by any police officers. Hancock wrote that there were findings by the Dallas County and District of Columbia medical examiner offices that Thomas had received blows to the head and that he had been "hogtied" at some point during his arrest. The problem lies in Crawford's equating "blows to the head" coupled with "hogtying" with a "beating." Crawford opined that, because Thomas had received blows to the head and because he had been hogtied, the conclusion necessarily followed that he had been beaten. This conclusion, however, does not necessarily follow from the information provided in Hancock's article. As the summary judgment proof in this case indicates, a criminal suspect may receive blows to the head and be hogtied by law enforcement officials and still not be "beaten." Notwithstanding the unfounded leap in Crawford's reasoning, it is not always true that someone recklessly disregards the truth when he, by negligence, makes an erroneous conclusion from the facts available to him.

"[The] reckless [disregard of the truth] is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. "The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had 'a high degree of awareness of . . . probable falsity.'" *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)). To demonstrate that a defendant made a statement with "a high degree of awareness

of probable falsity," the plaintiff must show, not negligence on the part of the defendant in ascertaining the truth, but that the defendant had actual subjective doubt about the truthfulness of the statements. *Id.* at 688, 109 S.Ct. at 2696 (quoting *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325). A defendant's negligent failure to investigate the veracity of his sources cannot constitute malice. *Id.* at 733, 88 S.Ct. at 1326; *Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 756 (Tex.1984); *Johnson v. Southwestern Newspapers Corp.*, 855 S.W.2d 182, 188 (Tex.App.—Amarillo 1993, writ denied). A plaintiff's allegation that the defendant was negligent in addressing the truth of a statement will be successful only when "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation [or when] there are obvious reasons to doubt the veracity of [his sources]." *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326.

Hancock's article gave the following facts upon which Crawford purportedly relied: (1) Thomas died after receiving blows to the head and being hogtied; (2) NAACP officials in Corsicana believed that Thomas had been beaten to death (multiple blunt force impact and positional compromise of respiratory system); and (3) two police officers (Officers Morris and Schafer) were fired for using excessive force and violating departmental policies in effectuating Thomas' arrest. Appellants presented no controverting evidence to show that Crawford, subjectively, thought the facts she put in the July 18 article were probably false. *See Casso*, 776 S.W.2d at 559. The summary judgment evidence establishes only that she was may have been negligent in her interpretation of Hancock's July 10 article, not that she disregarded the actual truth of the statement. The actual malice standard of *New York Times v. Sullivan* requires, if not actual knowledge of the falsity of a statement, then an actual subjective determination that the facts published are probably false. 376 U.S. at 279–80, 84 S.Ct. at 725–26. Crawford states unequivocally in her affidavit that she did not believe the facts in her article were false, and in support thereof she referred to the July 10 article and her belief that Hancock had a

reputation for writing factually accurate articles.

Crawford's statements in her affidavit, in the absence of any controverting summary judgment proof from appellants and despite her *non sequitur* conclusion that Thomas was beaten, conclusively established that she did not write the July 18 article with actual malice. *Casso,* 776 S.W.2d at 559; *Dracos,* 922 S.W.2d at 256; *Freedom Communications, Inc. v. Brand,* 907 S.W.2d 614, 620 (Tex.App.—Corpus Christi 1995, no writ) (actual malice cannot be inferred solely from the falsity of a challenged statement); *Ross v. Labatt,* 894 S.W.2d 393, 395 (Tex.App.—San Antonio 1994, writ dism'd w.o.j.) (blanket assertions that the defendant should have known that statement was false, without controverting summary judgment proof, is insufficient to demonstrate a fact issue on actual malice); *Martin v. Southwestern Elec. Power Co.,* 860 S.W.2d 197, 199–200 (Tex.App.—Texarkana 1993, writ denied) (same); *Breen v. DeLord,* 723 S.W.2d 166, 170 (Tex.App.—Austin 1986, no writ); *see also City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979) (once movant establishes right to summary judgment, burden shifts to nonmovant to demonstrate otherwise). The heightened concern demonstrated by both the United States and Texas Supreme Courts in ensuring that free speech is not chilled by the threat of defamation suits compels this conclusion. *See Connaughton,* 491 U.S. at 685–86, 109 S.Ct. at 2695; *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–26; *Casso,* 776 S.W.2d at 557–58.

Appellants' point of error is overruled, and the judgment is affirmed.