H. Zane BECK, Appellant,

v.

**LONE STAR BROADCASTING, CO., Remi Barron and Chuck McDonald, Appellees.**

No. 12–96–00179–CV.

Court of Appeals of Texas, Tyler.

March 31, 1998.

Rehearing Overruled May 29, 1998.

Charles H. Clark, Tyler, for appellant.

Trey Yarbrough, Tyler, for appellee.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

RAMEY, Chief Justice.

This appeal arises from a summary judgment against the Appellant, H. Zane Beck ("Beck"), who was the plaintiff in a suit for defamation and intentional infliction of emotional distress. Beck alleged that television station KETK and other defendants connected to the station (collectively, "Appellees") defamed him in a series of reports regarding the Tyler Independent School District ("TISD") and a criminal investigation into his involvement in TISD's search for a "Preferred Provider Organization" for their healthcare insurance program. Beck raises six assignments of error attacking the summary judgment; we will affirm.

In 1993, when Beck was the Assistant Superintendent for Business Services for TISD, a controversy arose over TISD's selection of a Preferred Provider Organization. Apparently, once an investigation into the controversy was made, Beck became the central figure, and he claims that he was wrongfully suspended and then terminated by TISD as a result of the controversy. Beck claims that KETK and its employees defamed him by accusing him of bid-rigging and racketeering. Though there is some dispute as to the facts, it appears that TISD's search for a Preferred Provider Organization became a competition between the two largest hospitals in Tyler: East Texas Medical Center ("ETMC") and Mother Frances Hospital ("MFH"). Beck allowed Tom Slack, TISD's third-party insurance administrator, to show officials at ETMC the bid proposal presented by MFH to TISD; allegedly, this enabled ETMC to underbid MFH to become TISD's preferred provider. Beck maintains that the proposals submitted by the hospitals were not part of a competitive bidding process and that in showing MFH's bid to ETMC he was attempting to negotiate a better contract for TISD. He contends that KETK consistently misrepresented his actions in their news stories on the subject by reporting "bidding irregularities" that "could have cost taxpayers one-and-a-half million dollars." Beck claims that KETK also falsely reported that he submitted a letter of resignation twice but that the school superintendent refused to accept it.

According to Beck's affidavit, the videotape exhibits in the record show that the station's news anchorman reported that "an assistant Tyler school superintendent intentionally allowed bids to be rigged" and that the FBI and a grand jury were investigating whether Beck had received any payment for letting ETMC see MFH's bid. Beck asserts that these allegations were repeated in other KETK broadcasts. The Appellees contend that their broadcasts contained none of the accusations Beck complains of but that every report of wrongdoing was qualified with such terms as "reportedly" and "allegedly." The Appellees submitted several transcripts of the KETK broadcasts to the trial court. Beck alleges that these scripts do not accurately reflect what was said over the airwaves by KETK's reporters and anchormen. Beck claims that because of these allegedly false and defamatory statements, he suffered emotional distress and was forced to take employment that paid less.

It is well settled that in order to obtain summary judgment, the movant must prove that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Johnson County Sheriff's Posse, Inc. v. Endsley*, 926 S.W.2d 284, 285 (Tex.1996) (citing TEX.R. CIV. P. 166a(c); and *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985)). When reviewing a summary judgment, the appellate court must accept as true all evidence favoring the nonmovant, and it must indulge every reasonable inference and resolve all doubts in the nonmovant's favor. *Endsley*, 926 S.W.2d at 285. Because they were the defendants in the instant case, the Appellees were entitled to summary judgment only if they conclusively negated at least one element of each of Beck's causes of action or conclusively established all of the elements of an affirmative defense. *Id.* (citing *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995)). When reviewing a summary judgment, the courts of appeals should consider all the grounds for summary judgment that the trial court rules on and that the movant preserves for appellate review; fur-

thermore, in the interest of judicial economy, the appellate courts may consider any other grounds preserved for review but not ruled upon by the trial court. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996).

■■■ The trial court's judgment in the instant case does not specify the grounds upon which summary judgment was granted. Nevertheless, we note that at the hearing on .the motion for summary judgment, the trial court stated that she based her decision on the fact that Beck was a public official and that he had failed to counter the Appellees' proof of the absence of malice. The court concluded with the following pronouncement:

. . .

the Defendants [Appellees] have presented the proof that is required, summary judgment proof to disavow any deliberate falsification or doubt as to the truthfulness of the published statement. The Plaintiff [Beck] has come forward but, however, I believe with insufficient controverting proof as to actual malice. Therefore, the Defendant's motion for summary judgment is granted.

Apparently, therefore, the summary judgment rests primarily on the issue of actual malice, one of the elements of Beck's defamation claim. Under the standard first enunciated by the United States Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in order for a public official to sustain a suit for defamation, he must "prove that the defendant (1) published a statement; (2) that was defamatory concerning the public official . . .; and (3) that the false statement was made with actual malice." *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989) (citing *Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–26). A defamatory statement of fact is made with actual malice when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. at 280, 84 S.Ct. at 726, 11 L.Ed.2d at 706. The Texas Supreme Court has further explained the concept of actual malice:

Actual malice, as used in defamation cases, is a term of art which is separate and distinct from traditional common law mal-

ice. It does not include ill will, spite or evil motive, but rather requires "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

*Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989); *accord, Hagler v. Proctor & Gamble Mfg. Co.,* 884 S.W.2d 771, 771–772 (Tex.1994); *Carr v. Brasher,* 776 S.W.2d at 571.

■■■ In his first point of error, Beck contends that the trial court erred by applying the federal standard for summary judgments rather than the stricter Texas standard. This question is governed by the Texas Supreme Court's decision in *Casso v. Brand,* 776 S.W.2d 551 (Tex.1989). There, the supreme court set out the appropriate standard for summary judgment in defamation cases brought by public figures and distinguished that standard from the federal standard. *Id.* at 555–556. In order to secure summary judgment under *Casso,* the Appellees must establish, as a matter of law, that they "did not believe the allegations [concerning Beck] were false and did not act with reckless disregard as to their truth or falsity in repeating those allegations" in their broadcasts. *Casso,* 776 S.W.2d at 559; *accord, Carr,* 776 S.W.2d at 571.

■■■ A defendant's own affidavit, in which he attests to the absence of malice, can be sufficient to shift the burden to the plaintiff to raise a fact issue concerning actual malice by offering controverting evidence. *Casso,* 776 S.W.2d at 559. Summary judgment will be proper only if no controverting proof is offered. *Id.* This does not place the burden on the plaintiff, as in the federal system, to "make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 556 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273 (1986)). The supreme court explained in *Casso* that Texas courts "use summary judgments merely 'to eliminate patently unmeritorious claims and un-

tenable defenses,'... and [they] never shift the burden of proof to the non-movant unless and until the movant has 'establish[ed] his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law.'" *Casso*, 776 S.W.2d at 556 (quoting *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 n. 5 (Tex.1979)). The distinction lies in the fact that in Texas, as stated in the Texas Rules of Civil Procedure, summary judgment will be proper if the evidence presented by the defendant to negate actual malice "could have been readily controverted":

> A summary judgment may be based on uncontroverted testimonial evidence of an interested witness ... if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

TEX.R. CIV. P. 166a(c). "'Could have been readily controverted' does not mean that the summary judgment evidence could have been easily and conveniently rebutted, but rather indicates that the testimony could have been effectively countered by opposing evidence." *Trico Technologies Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex.1997) (citing *Casso*, 776 S.W.2d at 558). Therefore, if the evidence negating malice in this case is of a sort that could have been effectively countered or arises from a context which would permit the existence of such controverting evidence, Beck's failure to present such controverting evidence would make summary judgment appropriate.

If the trial court correctly applied the summary judgment standard of *Casso*, it did not apply the federal standard and Beck's first point of error will fail. Therefore, our decision regarding Beck's first point of error depends upon and must await our determination of later points in which he challenges the appropriateness of summary judgment under the *Casso* standard.

Beck's second point of error likewise depends upon the outcome of his subsequent points. Here, he alleges that the trial court erred in failing to find that the statements made by the Appellees were defamatory, arguing in part that allegations of criminal wrongdoing are, if false, defamatory per se. Under *New York Times v. Sullivan* and its progeny, however, a public official may not recover for defamation unless the defendant made the defamatory remarks with actual malice. Therefore, Beck's points of error three and four, which address elements of a defamation claim under *New York Times v. Sullivan*, will be determinative.

In his third point of error, Beck asserts that the trial court erred in determining that he was a public official, an "all-purpose" public figure, or a "limited purpose" public figure, thus requiring proof of actual malice for recovery. Cases interpreting *New York Times v. Sullivan* have extended its requirements to cases in which a plaintiff may not be a public official, but is nevertheless a figure of sufficiently public notoriety, whether in all circumstances (an "all-purpose" public figure) or with regard to a particular public controversy ( a "limited-purpose" public figure), to justify holding him to proof of actual malice. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974); *San Antonio Exp. News, a Div. of Hearst Corp. v. Dracos*, 922 S.W.2d 242, 251 (Tex.App.—San Antonio 1996, no writ).

The Supreme Court has established a minimum standard by which a plaintiff may qualify as a public official:

> The public official designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.... Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, ... the *New York Times* malice standards apply.

*Rosenblatt v. Baer*, 383 U.S. 75, 85–86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966) (footnotes omitted). The court further explained that this definition balances society's inter-

ests in protecting reputations and encouraging free discussion of governmental affairs because the public official's "position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* at 86 n. 13, 86 S.Ct. at 676 n. 13. The definition of a public official set out in *Rosenblatt* has been applied by the courts of Texas. *See Rogers v. Cassidy,* 946 S.W.2d 439, 444–445 (Tex.App.—Corpus Christi 1997, no writ); *Hailey v. KTBS, Inc.,* 935 S.W.2d 857, 859 (Tex.App.—Texarkana 1996, no writ); and *Johnson v. Southwestern Newspapers Corp.,* 855 S.W.2d 182, 186 (Tex. App.—Amarillo 1993, writ denied).

During the hearing on the Appellees' motion for summary judgment, the trial court announced her finding that Beck was a public official:

> Mr. Beck is a public official for all purposes. His position as chief financial officer of Tyler Independent School District certainly placed him in a position of public trust, of public confidence and public scrutiny. He had the opportunity by his very position within the administration to influence resolution of public issues, especially one such as this, and it is the subject matter of this lawsuit which involves major public institutions and resources within this community.

The summary judgment evidence supports the trial court's characterization of Beck's importance as the assistant superintendent for business services. The superintendent of TISD described Beck's duties and responsibilities in his deposition testimony:

> He is in charge of handling accounts payable and receivable, that is paying the bills of the district, utilities, vendors that we buy things from. He's also— has under his control payroll, which disperses checks. He had as a major function preparing the school budget each year in conjunction with myself and others, but basically he puts the budget together. He advises us on tax rates, if we need to raise it or leave it alone. He also had under his control maintenance, the warehouse, transportation, and these are all major, major opera-

tions, school food service program, so it's— it's a pretty hefty responsibility.

He further stated that Beck was the official spokesman for TISD on financial affairs and that he often made announcements for TISD to the public through the news media. The superintendent also said that Beck was the instigator and the decision maker in the process of choosing a Preferred Provider Organization for health services for TISD employees and that because TISD was the second largest employer in the city, with approximately 2,100 employees, the choice was of public importance. In his own deposition testimony, Beck stated that he was the person designated by TISD to make announcements or to answer questions from the news media concerning financial and other matters.

■ The summary judgment record reveals that Beck held a position of "substantial responsibility for or control over the conduct of governmental affairs" and that regarding his position, the public had "an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt,* 383 U.S. at 85–86, 86 S.Ct. at 676. His position merited public scrutiny even apart from that generated by the controversy in question here. *Id.* at 86 n. 13, 86 S.Ct. at 676 n. 13. Consequently, The summary judgment evidence demonstrates that Beck was a public official as envisioned in *Rosenblatt,* and we need not consider whether he was an all-purpose or limited purpose public figure. Beck's third point of error is overruled.

■ In his fourth point of error, Beck asserts that in the event he is considered a public official, the trial court erred in granting summary judgment because the Appellees did not negate the existence of actual malice. As stated above, a defamatory statement of fact is uttered with actual malice when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706; *accord, Hagler v. Proctor & Gamble Mfg. Co.,* 884 S.W.2d 771, 771–772 (Tex.1994). Reckless disregard may be de-

fined as "a high degree of awareness of probable falsity." *Carr*, 776 S.W.2d at 571; *accord, Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989). In order to prove reckless disregard at trial, a plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)).

Each of the individual appellees presented affidavits to the trial court in which they denied having any knowledge or belief that any of their broadcasts contained false statements and denied having any doubts as to the truth of those statements. Typical of those attestations is that of the defendant who was the president and general manager of KETK:

> At no time pertinent to the events made the subject of this lawsuit did I believe, or have any knowledge or reason to believe, that any of the KETK news coverage, reporting, or broadcasts about Zane Beck were false. At no time did I ever entertain any doubt as to the truth of what was being reported and broadcast by KETK and its employees.

Such a disavowal by all of the defendants met the standards enunciated in *Casso*, set out above, under which a defendant's own affidavit attesting to the absence of malice can be sufficient to require the plaintiff/non-movant to offer independent evidence to raise a fact issue concerning malice. *Casso v. Brand*, 776 S.W.2d at 559. The burden to present some controverting evidence then shifted to Beck.

The evidence cited by Beck regarding malice consists of twenty-two separate assertions, primarily concerning the Appellees' alleged failure to fully investigate the claims of Beck's wrong-doing prior to reporting them. One example of this type of assertion centers on the deposition testimony of Johnny Johnson, the TISD board member who was the original source for the offending news reports. Remi Barron ("Barron"), who was a defendant in the case and a reporter for KETK, claimed to have used Johnson as his source for the stories about Beck's alleged improprieties. Beck alleges that Johnson's deposition testimony does not support the claims made by Barron and KETK in their broadcast reports that there were allegations of "bid-rigging and racketeering," that Beck had offered to resign, or that Beck's provision of the MFH proposal to ETMC was improper. Indeed, Johnson testified that he did not think he ever used the term "racketeering" when talking to Barron or the FBI, and he could not recall whether he had described Beck's activities as "bid-rigging." Johnson did state, however, that he believed Beck's action to be illegal and that he was told so by an attorney for TISD. When questioned, he defined "racketeering" as collusion between two or more people to accomplish criminal activity; he then repeatedly described the process by which the MFH bid was revealed to ETMC as "collusion" between Beck and others. He even referred to concerns shared by those involved that Beck's secretary had engaged in document destruction. Johnson's testimony also indicated that KETK's reports reflected what he believed concerning the amount of money at stake and Beck's offers to resign.

■ Though Johnson may not have used the terms "bid-rigging" and "racketeering" when he spoke to Barron, we do not believe that the Appellees' use of those terms constituted reckless disregard for the truth under these circumstances. An analogous dispute arose in *Morris v. Dallas Morning News, Inc.*, 934 S.W.2d 410, 420 (Tex.App.—Waco 1996, writ denied), in which a defamation defendant had written an article asserting that a crime suspect died after receiving a "beating" by police. The summary judgment evidence showed that the suspect had been trying to escape and struggled with the officers when the officers struck him and "hogtied" him. The court of appeals held that the term "beating" was not an accurate description and that the defendant could not rely on truth as a defense. The court went on to hold, however, that summary judgment for the defendant was proper because the defendant negated the element of actual malice. The defendant claimed to have based her story on news articles by reporters she trust-

ed, which articles contained the facts concerning the blows to the head and hog-tying suffered by the suspect; therefore, her use of the term "beating," though technically inaccurate, was sufficiently descriptive of what happened so that reckless disregard for the truth could not be imputed to her. *Id.*, 934 S.W.2d at 420–21. Likewise, in the instant case, the Appellees' use of the words "bid-rigging" and "racketeering" may be lacking in technical accuracy, but they are sufficiently close to the allegations made by Johnson, of collusion and illegal communications regarding the negotiations, to negate any suggestion of reckless disregard for the truth in the Appellees' use of those terms.

■■■ Beck contends that the Appellees failed to sufficiently investigate Johnson's allegations before reporting them and that such evidence of carelessness is sufficient to raise a fact issue as to actual malice. His argument fails for two reasons. First, we observe that the mere failure of a defendant to fully investigate the accuracy of published information or the credibility of a source does not constitute actual malice. *See St. Amant*, 390 U.S. at 733, 88 S.Ct. at 1326; *Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 756 (Tex.1984); *El Paso Times v. Trexler*, 447 S.W.2d 403, 406 (Tex.1969); *Ross v. Labatt*, 894 S.W.2d 393, 395 (Tex.App.—San Antonio 1994, writ dism'd w.o.j.); *Johnson v. Southwestern Newspapers Corp.*, 855 S.W.2d at 188. In addition to this, we note that the summary judgment evidence does not appear to establish even a failure to fully investigate the stories. In one of his twenty-two assertions of evidence of actual malice on the part of the Appellees, Beck claims that because Johnson remembered only one occasion on which he met with Barron regarding the allegations, the Appellees reported the alleged malfeasances without sufficient investigation to corroborate all of the allegations. Barron's deposition testimony sets out several steps which he took to verify Johnson's claims, however, including the observation of the TISD superintendent going into the grand jury room at exactly the time Johnson had said the grand jury was set to investigate the matter. Barron also received confirmation from another school board member that the matter had been submitted to the grand jury.

■■■ Beck also argues that the Appellees have admitted that they had serious doubts regarding the veracity of Johnson's claims because Barron and others testified that they were "shocked" to hear such allegations about Beck. We disagree. Shock does not equate with doubt; one may be shocked to hear of an untimely death without doubting its reality. All of Beck's allegations of the Appellees' failure to adequately investigate the truth of their sources amount to no more than claims of negligence; as such, his allegations will not establish a fact issue regarding actual malice unless they demonstrate that the Appellees depended on sources that were "so inherently improbable that only a reckless man would have put them in circulation [or when] there are obvious reasons to doubt the veracity of [his sources]." *Morris v. Dallas Morning News, Inc.*, 934 S.W.2d at 420 (quoting *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326). Beck presented no controverting summary judgment evidence to suggest that there were obvious reasons to doubt any of the reported claims and cannot therefore demonstrate a fact issue on actual malice based on such a claim. *See Ross v. Labatt*, 894 S.W.2d at 395; *Morris v. Dallas Morning News, Inc.*, 934 S.W.2d at 421.

■■■ Another area on which Beck focuses his search for evidence of actual malice is in alleged discrepancies and contradictions in the affidavits and depositions of the defendants. He alleges that a contradiction exists between the Appellees' claims in their affidavits that they reviewed the scripts of their broadcasts carefully and a statement by a reporter to the effect that he usually wrote his own scripts and read them without the review of a superior. Beck finds another alleged contradiction in the Appellees' evidence in statements concerning the amount of training that KETK provides new reporters. Whether the supposed contradictions exist, they have no bearing on a determination of malice in this case. Evidence regarding insufficient proofreading or training, as with evidence of inadequate investigation, may have a bearing on whether a media entity was negligent in its reporting, but the

redoubtable *New York Times* standard renders the question of negligence immaterial; the plaintiff/nonmovant must show that there is some evidence that the defendant/movant knew his statements to be false or entertained serious doubts concerning their veracity.

All of Beck's factual assertions appear to involve such claims of negligence or incompetence on the part of the Appellees in their reporting of what all parties concede was a complicated story. Again, we observe that in order to demonstrate that the Appellees made a statement with the requisite "high degree of awareness of probable falsity," Beck was required to show that the Appellees had actual subjective doubt about the truthfulness of the statements, not that they were merely negligent in ascertaining the truth. *Morris v. Dallas Morning News, Inc.,* 934 S.W.2d at 420 (citing *Harte–Hanks Communications, Inc.,* 491 U.S. at 688, 109 S.Ct. at 2696). For these reasons, we hold that the trial court correctly determined that the Appellees negated the question of actual malice under the *Casso* standard and that Beck failed to present controverting evidence sufficient to raise a fact issue regarding actual malice. Therefore, we overrule Beck's fourth point of error.

As stated above, our determination of Beck's first and second points of error were dependent on our holding with regard to points three and four. Because we have held that the trial court correctly applied the *Casso* standard, we hold that the trial court did not apply the federal standard for summary judgments in this case. Furthermore, because Beck was a public official, the fact that the statements made by the Appellees may have been defamatory is immaterial because there was no evidence of actual malice. Because of our holdings under points of error three and four, we overrule Beck's first and second points of error.

Beck's fifth point of error is related to his fourth. In his fifth point, he alleges that "the trial court erred in not heeding the

Texas Supreme Court's warning not to grant summary judgment when the credibility and veracity of the defendants is a dispositive factor in the case." This point echoes the language of the supreme court in *Casso,* in which the court averred that:

> [i]f the credibility of the affiant or deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate. On the other hand, if the non-movant must, in all likelihood, come forth with independent evidence to prevail, then summary judgment may well be proper in the absence of such controverting proof.

*Casso,* 776 S.W.2d at 558. The quoted language, however, is part of the supreme court's reasoning in reaching their ultimate holding: that summary judgment may be appropriate in a defamation case even when based on a defendant's denial of knowledge or awareness of falsity and of any doubt as to the truth, when that denial is uncontroverted by any independent summary judgment evidence. In *Casso,* therefore, the court acknowledged that a defendant's affidavit or deposition testimony, in which he denies knowledge of falsity, may be the type of testimony that is "of a nature which can be effectively countered by opposing evidence." *Id.* Lending further support to its holding that summary judgment is sustainable in defamation cases, the court went on to state that if a defamation plaintiff cannot obtain controverting proof of actual malice "during the discovery process, he is unlikely to stumble upon it at trial." *Id.* at 559. Therefore, *Casso* and its progeny embody the recognition by the courts of Texas that the credibility of a defendant is not the dispositive issue in these cases and that independent evidence of actual malice is necessary to defeat summary judgment.[1] *See, e.g., Free v. American Home Assurance Co.,* 902 S.W.2d 51, 56 (Tex.App.—Houston [1st Dist.] 1995, no writ). Consequently, we overrule Beck's fifth point of error.

---

1. The Supreme Court did not specify in *Casso* what type of independent summary judgment evidence could be used to controvert a defamation defendant's subjective denial of culpability.

It may be that such independent controverting evidence will be no more than a theoretical possibility in most cases.

In his sixth and final point of error, Beck contends that the trial court erred in granting summary judgment on his claim of intentional infliction of emotional distress. In order to recover at trial on his claim of intentional infliction of emotional distress, Beck would have to prove that the Appellees (1) acted intentionally or recklessly (2) in an extreme and outrageous manner (3) that caused him to suffer emotional distress (4) that was severe. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex. 1995); *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993). As stated above, summary judgment for the defendant is appropriate if the summary judgment evidence conclusively negates one of the essential elements of the cause of action. *Randall's Food Markets,* at 644 (citing *Wornick Co.,* at 733; and *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970)). In reviewing a summary judgment, we must accept all evidence in favor of the non-movant as true and indulge every reasonable inference and resolve all doubts in favor of the non-movant. *Randall's Food Markets,* at 644 (citing *El Chico Corp. v. Poole,* 732 S.W.2d 306, 315 (Tex.1987)).

Beck argues that "calling someone a racketeer and a bid-rigger is 'extreme and outrageous.'" That is the only assertion of such conduct he makes under this point of error. In *Randall's Food Markets,* the supreme court reiterated that "extreme and outrageous conduct" in this context may be defined as conduct that is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 644 (quoting *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) and RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). There, the court held that the summary judgment evidence established as a matter of law that the defendant's conduct was not "extreme and outrageous." *Id.* at 644; *see also Free,* 902 S.W.2d at 56.

Our reasoning under Beck's fourth point of error with regard to the allegations of bid-rigging and racketeering dictates that we may not characterize those statements as "beyond all possible bounds of decency, ... atrocious, and utterly intolerable in a civilized community." The summary judgment evidence revealed that the Appellees had information from reliable sources that suggested illegality on Beck's part, including the fact that he was called before a grand jury. As stated above, the Appellees' choice in referring to alleged racketeering and bid-rigging was a natural, if exaggerated, inference from their source's report of "collusion" and cheating on a competitive bid, regardless of whether the source's own description of the underlying transactions was apt. The use of such language did not constitute malice or reckless disregard for the truth in the defamation context, and it cannot be said to be "extreme and outrageous" in this context. At worst, the use of such terms constituted negligence on the part of reporters. Accepting all evidence favorable to Beck as true, we hold that the summary judgment evidence conclusively negates the possibility that the Appellees' statements were "extreme and outrageous." Because that element of Beck's cause of action for intentional infliction of emotional distress fails as a matter of law, summary judgment on that cause was proper.[2] Beck's sixth point of error is overruled.

Having overruled all of Beck's points of error, we affirm the trial court's entry of summary judgment.

---

**2.** *See also Hailey v. KTBS, Inc.,* 935 S.W.2d 857, 861–862 (Tex.App.—Texarkana 1996, no writ) ("Since any such recovery would necessarily be derived from the same defamatory utterances to which we have applied the *New York Times* rule, the same reasoning would preclude recovery for emotional distress.")